UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERT S. MANCINI,

                Plaintiff,

– against –

UBS AG, NEW YORK BRANCH,

                Defendant.

**OPINION & ORDER**

1:23-cv-09815 (ER)

Ramos, D.J.:

      Robert S. Mancini, an investment professional, brings this action against The New York branch of UBS AG ("UBS") alleging breach of the implied covenant of good faith and fair dealing and breach of the duty of commercial reasonableness stemming from UBS's allegedly unlawful disposition of certain private equity investments belonging to Mancini. UBS had retained an ownership interest in the investments as collateral in case of certain contingencies or default on a loan it had made to Mancini. One such contingency occurred when Mancini left his role as Managing Director of the Carlyle Group in December 2018, triggering UBS's right to recover the loan balance, which included the right to sell the collateral. Before the Court is UBS's motion for judgment on the pleadings. Doc. 19. For the reasons set forth below, the motion is GRANTED.

**I.    BACKGROUND**

    **A.  Factual Background**

      Prior to June 6, 2018, Mancini was a Managing Director and a Global Partner of the Carlyle Group ("Carlyle"), a New York private equity firm. Doc. 13 (First Amended Complaint) ¶ 6. While in this position, Mancini participated in certain private equity investments known as "Carlyle Co-investment Entities" ("CCEs"). *Id.* Through an arrangement between UBS and Carlyle, UBS offered financing to eligible participants, including Carlyle Managing Directors and Global Partners such as Mancini, in

connection with these participants' acquisition of interests in one or more CCEs, which are similar to securities. *Id.* ¶ 8.

Pursuant to this financing arrangement between UBS and Carlyle, on January 8, 2013, Mancini and UBS executed a "Borrower and Summary Credit Agreement" and other financing documents, acknowledging Mancini's receipt and understanding of the "Master Credit Agreement" (the "credit agreement") between Mancini (as a borrower) and UBS (as the bank/creditor), dated September 15, 2011. Doc. 18-1, Exhibit A; Doc. 13 ¶ 9. Through the credit agreement, UBS extended credit to Mancini for his CCE investments. Doc. 13 ¶ 10. This credit was secured by Mancini's interests in the CCEs, which stood as collateral for the underlying loan; UBS thus maintained full custody of the CCEs under the credit agreement. *Id.* ¶ 11. The credit agreement is governed by New York law. *Id.* ¶ 12.

On June 6, 2018, Mancini ceased to be a Managing Director and Global Partner of Carlyle, transitioning to "senior advisor" status, a position he held until December 2018. *Id.* ¶ 13. In December 2018, Mancini fully withdrew from Carlyle and ceased to qualify as an "eligible participant" under the credit agreement. *Id*. By letter dated February 5, 2019, UBS notified Mancini that his withdrawal from Carlyle constituted a "Final Event" as defined in § 1.49 of the credit agreement:

> 1.49 "<u>Final Event</u>" means, with respect to a Loan Party, (a) such Loan Party ceases to be an Eligible Participant or (b) such Loan Party ceases to be a limited partner or member of any of the Carlyle Coinvestment Entities, the Carlyle Entity Interests of which have been pledged to the Bank as Collateral hereunder in connection with the applicable Credit Line.

Doc. 18-1, Exhibit A. In this same February 5, 2019 letter, UBS demanded repayment by the maturity date of the loan, March 15, 2019. Doc. 13 ¶ 13. On February 15, 2019, Mancini and UBS agreed to extend the loan's maturity date to March 1, 2020, by which time Mancini would be required to repay the loan. *Id.* ¶¶ 14, 16.

2

Section 8.1 of the credit agreement and UBS's status as a secured party under the New York Uniform Commercial Code ("U.C.C.") provided that:

> if [Mancini] failed to pay amounts when due under the Credit Agreement, then all amounts due on the loans became immediately due and payable and "[UBS] may, in its sole and absolute discretion . . . liquidate, withdraw or sell, in each case . . . all or any part of the Collateral pledged to secure such Credit Line Obligations and apply the same, as well as the proceeds to any liquidation or sale, to any amounts owed to [UBS]."

Doc. 18 (Answer) ¶ 16; Doc. 18-1, Exhibit A. The credit agreement required that if UBS decided to liquidate the collateral, it was required to do so in a "commercially reasonable" manner, per applicable New York law, including the U.C.C. Doc. 13 ¶ 16. In the event that UBS determined to liquidate the collateral, the bank would be legally required to provide Mancini with reasonable notice, and the parties agreed in § 8.1(p) of the credit agreement that "ten (10) calendar days['] notice . . . will be deemed reasonable notice of the . . . time after which any private sale or other disposition of the Collateral may occur." Doc. 18-1, Exhibit A at § 8.1(p). This clause in the credit agreement reflects New York law's requirement that "a secured party that disposes of collateral [after a debtor's default] shall send [the debtor] a reasonable authenticated notification of disposition," and that "[such] notification of disposition sent after default and *10 days or more* before the earliest time of disposition . . . is [considered] sent within a reasonable time." N.Y. U.C.C. § 9-611(b); N.Y. U.C.C. § 9-612(b) (emphasis added).

Mancini claims that "at the end of 2019" his portfolio had a fair market value of "more than $4 million." Doc. 13 ¶ 15. In March 2020, the coronavirus pandemic caused a sharp and significant decline in the value of Mancini's holdings in the CCEs. *Id.* ¶ 20. "In or about March 2020," a senior executive of UBS verbally assured Mancini that, given the pandemic-caused market declines, UBS did not, at that time, intend to liquidate the collateral. *Id.* ¶ 21. In its Answer, UBS denies this allegation and asserts that, pursuant to § 4.1 of the credit agreement, "all amounts due on the loans became due and

3

payable in full upon the Extended Maturity Date of March 1, 2020, and that [Mancini] failed to repay all amounts due and owing on the loans to [UBS] at that time." Doc. 18 ¶ 21.

On August 26, 2020, UBS provided Mancini with written notice of its intention to sell the collateral in a private sale "sometime on or after September 10, 2020." Doc. 18-2, Exhibit B; Doc. 13 ¶ 22. This timeline afforded Mancini 5 additional days beyond the 10-day notice period required and deemed commercially reasonable by the credit agreement and the U.C.C. for impending collateral sales.[1] Doc. 20 at 3; N.Y. U.C.C. § 9-612(b). Again, § 8.1(p) of the credit agreement provides that "ten (10) calendar days['] notice . . . will be deemed reasonable notice of the . . . time after which any private sale or other disposition of the Collateral may occur." Doc. 18-1, Exhibit A at § 8.1(p).

Sometime in September, but before September 10,[2] Mancini phoned UBS to discuss purchasing the indebtedness and redeeming the collateral himself. Doc. 13 ¶ 23. UBS informed Mancini that the liquidation proceedings had already begun, such that Mancini could not redeem the collateral because it was "too late." *Id.* UBS successfully liquidated the collateral by private sale in October 2020.[3] *Id.* ¶ 24.

On October 1, 2020, Mancini requested a full accounting of his indebtedness and of the sale of the collateral. *Id.* ¶ 27. UBS sent Mancini a letter dated November 20, 2020 with the requested accounting, showing that, as of October 9, 2020, Mancini was indebted to UBS in the amount of $2,017,123.50, that UBS had realized total gross proceeds of $2,895,229, and that UBS had taken out total expenses of $358,652.33,

---

[1] Mancini later vacillates on whether UBS complied with the 10-day minimum notice requirement. *See* Doc. 24 at 6 ("UBS did provide notice of the collateral sale that satisfied the bare time constraint of the credit agreement"); *see also id.* at 13 n.8 ("The allegation that UBS's purported notice concealed the actual date on which the collateral was disposed, and after which [Mancini] was 'too late' to discuss redeeming his collateral, also supplies 'specific factual allegations of UBS's alleged bad faith.'").

[2] The amended complaint does not allege the specific date of this phone call, but notes it occurred "[i]n early September 2020, but before September 10." Doc. 13 ¶ 23.

[3] Neither party states when the sale commenced or closed (only that the sale closed sometime in October 2020).

4

resulting in total net proceeds of $2,536,576.67—almost half a million dollars above the loan balance of $2,017,123.50. *Id.* ¶ 31; Doc. 18-3, Exhibit C. This resulted in a surplus of $519,453.17, which was returned to Mancini. *Id.*

The accounting also reflected that UBS had used Carlyle March 31, 2020 fair market values ("March 31 marks") in marketing the portfolio. *Id.* ¶¶ 28, 32. The March 31 marks were used in the October sale even though Mancini alleges that "[u]pon information and belief, the Carlyle June 30 marks were available well before liquidation of the portfolio and before active marketing of the portfolio had begun." *Id.*

### B. Procedural History

Mancini originally filed this action on November 6, 2023. Doc. 1. A first amended complaint was filed on February 9, 2024. Doc. 13. Mancini brings claims for breach of the implied covenant of good faith and fair dealing, as well as breach of the duty to exercise commercial reasonableness. *Id.* ¶¶ 36–46. UBS answered on March 15, 2024. Doc. 18. On this same date, UBS also filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Doc. 19.

## II. LEGAL STANDARD

### A. Rule 12(c)

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Pleadings" include both the "complaint" and the "answer to [the] complaint." Fed. R. Civ. P. 7(a). "The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that [for granting] a Rule 12(b)(6) motion for failure to state a claim." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (internal quotation marks and citation omitted). To survive a Rule 12(c) motion, a plaintiff's complaint "must contain sufficient factual matter, accepted a true, to state a claim to relief that is plausible on its face." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (citation omitted). To

5

establish the factual landscape of the case on a 12(c) motion, the Court may consider "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (quoting *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009)). "The Court may also consider documents incorporated into the complaint by reference or integral to the complaint, provided there is no dispute regarding their authenticity, accuracy, or relevance." *Thyssenkrupp Materials NA, Inc. v. M/V Kacey*, 236 F.Supp.3d 835, 838 (S.D.N.Y. 2017) (quoting *L–7 Designs*, 647 F.3d at 422); *see also Piazza v. Florida Union Free Sch. Dist.*, 777 F.Supp.2d 669, 677 (S.D.N.Y. 2011). In addition to accepting the pleadings' and incorporated documents' factual allegations as true, the Court draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "allegations that are 'conclusory' are 'not entitled to be assumed true.'" *Lynch*, 952 F.3d at 74, 75 (quoting *Iqbal*, 556 U.S. at 679, 681). After reviewing the pleadings and attached exhibits, a 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." *Burns International Security Services, Inc. v. International Union, United Plant Guard Workers of Am. (UPGWA) & Its Local 537*, 47 F.3d 14, 16 (2d Cir. 1995) (per curiam). "[W]here the material facts are undisputed, the Court may decide as a matter of law that the [defendant's] actions were commercially reasonable." *Leigh Co. v. Bank of New York*, 617 F. Supp. 147, 153 (S.D.N.Y. 1985) (internal citations omitted).

### III.   DISCUSSION

Mancini asserts two claims: (1) breach of the implied covenant of good faith and fair dealing, and (2) breach of the duty to exercise commercial reasonableness. Doc. 13. The Court addresses each of the two claims in turn.

### A. Breach of the Implied Covenant

Mancini argues that UBS breached the implied covenant of good faith and fair dealing in three ways: by using "stale" March 31 fair market values ("marks") to market

6

the collateral instead of the more recent June or September marks, which Mancini contends led to lower than attainable sale proceeds; by not deferring the collateral sale to October or early November, when September 30 marks would have purportedly been available; and, regarding notice of the sale, by telling Mancini over the phone that it was "too late" to "bid in" to the sale, which rendered UBS's compliance with reasonable notice requirements "meaningless." Doc. 24 at 6, 8.

In response, UBS cites its ability under § 8.1 of the credit agreement to conduct the collateral's sale according to its discretion and in its sole and absolute authority. Doc. 20 at 7. The bank maintains that this discretion and an absence of case law indicating otherwise exempt UBS from having to defer the sale according to Mancini's wishes. *Id.* at 3. For the marketing claim, UBS similarly asserts its discretion under the credit agreement, namely that UBS's purported use of "stale" but otherwise accurate marks was valid. *Id.* at 3, 15. Lastly, UBS contests Mancini's notice claim by highlighting that Mancini was afforded reasonable notice according to § 8.1 of the credit agreement, with no contrary contractual language, facts, or case law cited by Mancini to demonstrate that the parties' phone conversation rendered UBS's notice "meaningless." Doc. 18 ¶ 33. Doc. 20 at 6.

The Court agrees with UBS; the credit agreement and applicable New York law support the position of UBS that it did not breach the implied covenant through its marketing, timing, or provisions of notice of the sale.

New York law provides that a covenant of good faith and fair dealing is included in every contract. *Kader v. Paper Software, Inc.,* 111 F.3d 337, 342 (2d Cir. 1997). The implied covenant is breached when one party's actions "would deprive the other party of receiving the benefits under their agreement." *Sorenson v. Bridge Capital Corp.,* 861 N.Y.S.2d 280, 282 (N.Y. App. Div. 2008). Specifically, "[a] cause of action for breach of an implied warranty of good faith and fair dealing requires the pleading of *intent* by the breaching party to deprive the injured party of his rights under the contract." *Schroeder*

7

*v. Capital One Financial Corp.*, 665 F. Supp. 2d 219, 226 (E.D.N.Y. 2009) (emphasis added). Accordingly, "[t]o prove a violation of the implied covenant of good faith and fair dealing, conclusory allegations of a party's failure to act in good faith alone are insufficient; specific factual allegations of a party's bad faith acts are required." *Kortright Capital Partners LP v. Investcorp Investment Advisers Ltd.*, 257 F. Supp. 3d 348, 360 (S.D.N.Y. 2017) (quoting *Ferguson v. Lion Holding, Inc.*, 478 F. Supp. 2d 455, 469 (S.D.N.Y. 2007)).

"Under New York law, when a contract contemplates the exercise of discretion, the covenant of good faith and fair dealing includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Sveaas v. Christie's, Inc.*, 452 F. App'x 63, 66 (2d Cir. 2011) (internal quotations and citation omitted). "Nevertheless, the duties imposed by an implied covenant of good faith and fair dealing are 'not without limits, and no obligation can be implied that would be inconsistent with other terms of the contractual relationship.'" *State Street Bank and Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 170 (2d. 2004) (quoting *Dalton v. Educational Testing Service*, 87 N.Y.2d 384, 389 (N.Y. 1995)). "[W]here a contract allows one party to [exercise a contractual right] in its 'sole discretion' and 'for any reason whatsoever' the covenant of good faith and fair dealing cannot serve to negate that provision." *111 W. 57th Inv. LLC v. 111 W57 Mezz Inv. LLC*, 198 N.Y.S.3d 521, 523 (N.Y. App. Div. 2023) (quoting *Transit Funding Association, LLC v. Capital One Equipment Finance Corp.*, 48 N.Y.S.3d 110, 114 (N.Y. App. Div. 2017)). Regarding deferral, New York law imposes no duty to defer sale of collateral following a debtor's default: "The fact that a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, disposition,

8

or acceptance was made in a commercially reasonable manner." N.Y. U.C.C. § 9-627(a).[4]

### 1. UBS Was Under No Obligation to Defer Sale

Mancini argues that because UBS did not defer the collateral's sale to October or early November, the bank breached the implied covenant.[5]  Doc. 13 ¶ 32.  Mancini contends that, had UBS waited, the September 30 marks would have been available and supposedly garnered a higher sales price.  *Id.*  The Court is unpersuaded.  It is not evident from the alleged facts how UBS intentionally, *Schroeder*, 665 F. Supp. 2d at 226, or in bad faith, *Kortright*, 257 F. Supp. 3d at 360, deprived Mancini of his benefits under the credit agreement by holding the sale in September, with a closing in October.  *Sorenson*, 861 N.Y.S.2d at 282.  Nor was there *any* obligation under the credit agreement that UBS use particular marks or methods to market the collateral or time the sale.  *State Street*, 374 F.3d at 169–70.  Rather, UBS had "sole and absolute" discretion to liquidate the collateral, *111 W. 57th Inv.*, 198 N.Y.S.3d at 523, which it did not appear to exercise "arbitrarily or irrationally." *Sveaas*, 452 F. App'x at 66.  New York's U.C.C. similarly does not impose a duty on creditors to delay sale or adhere to a particular timing or method.  N.Y. U.C.C. § 9-627.  Thus, Mancini fails to make clear why the timing of the sale and related use of March marks were unlawful.

Additionally, the "benefit" that Mancini argues he was deprived of—a greater surplus from the collateral's sale—is not a right or benefit assured to Mancini, *Sorenson*, 861 N.Y.S.2d at 282, a duty owed by UBS in exercising its absolute discretion under the credit agreement, *State Street*, 374 F. 3d at 169–70; *111 W. 57th Inv.*, 198 N.Y.S.3d at 523,

---

[4] § 9-627 is most applicable to assessing commercial reasonableness.  However, Mancini asserts that UBS failed to exercise commercial reasonableness *through* its purported breach of the implied covenant: "[UBS] has breached the covenant of good faith and fair dealing implied [in the credit agreement]. Its duty when liquidating Mancini's collateral was to exercise commercial reasonableness, and it did not."  Doc. 13 ¶ 37.  Thus, discussion of U.C.C. § 9-627 applies to both of Mancini's claims.  *See infra*, Part B.

[5] Mancini does not assert that he ever *asked* UBS to defer the sale after he received the August 26, 2020 notice.

9

or a requirement under the implied covenant of good faith and fair dealing. N.Y. U.C.C. § 9-627. Lastly, the U.C.C. provides that secured parties like UBS are under no obligation to defer disposition of collateral after a debtor's default. *Id.* In other words, there is no contractual *or* extra-contractual basis under which Mancini can claim that UBS unlawfully failed to defer the sale. Therefore, UBS did not breach the implied covenant through its timing of the sale.

2. *UBS's Failure to Use More-Recent Fair Market Value Marks*

Mancini argues that by failing to use more recent June or August marks in marketing the collateral, UBS deprived him of the "fruits of his contract," i.e., a greater surplus from the sale of the collateral. Doc. 13 ¶ 38.

UBS argues that the marks "exhibited significant volatility throughout 2020 and . . . could be assessed in whole or part by reference to a well-known equity investment 'benchmark,' the value of which changes (sometimes substantially) on a daily basis." Doc. 20 at 13. UBS thus asserts that for "any quarterly fair market valuations that [it] could have used in its marketing efforts would necessarily have been significantly dated and therefore immaterial to the price at which the Collateral ultimately sold."[6] *Id.* In other words, there was no guarantee that using later marks would be more favorable or yield a higher price, and the credit agreement contained no such guarantee or assurance.[7]

---

[6] While UBS denies that it specifically used the March marks in advertising the collateral, the bank "believes [the information/marks it did use] to be true and accurate." Doc. 18 ¶ 32.

[7] UBS criticizes Mancini's factual allegations—that the bank used stale marks and that these marks resulted in lower sale proceeds—on the basis that Mancini insufficiently pled these allegations "upon information and belief." Doc. 20 at 3, 11; Doc. 26 at 6–7. Mancini contests this conclusory characterization of his marketing claim, saying that he "has not had the opportunity to address such an argument with a pleading that cures the alleged insufficiency . . . [he] can and would plead specific facts to demonstrate the plausibility of his present 'information and belief' allegations. Examples [include] UBS's knowledge or possession of the June marks when it relied in marketing solely on the stale March marks, and the likelihood that a marketing effort with current (June or even next quarter) marks would yield greater proceeds of sale." Doc. 24 at 8. It is true that allegations made upon information and belief that are too lacking in detail "to nudge plaintiff['s] claims across the line from conceivable to plausible, [can be] insufficient to support [a] claim," rendering that allegation conclusory. *Haggood v. Rubin & Rothman, LLC*, No. 14-cv-34L, 2014 WL 6473527, at *12 (E.D.N.Y. Nov. 17, 2014). "[W]hile a plaintiff may plead facts alleged upon information and belief where the belief is based on factual information that makes the

Mancini does not show how using these marks constituted arbitrary or irrational conduct, *Sveaas*, 452 F. App'x at 66, or even that more recent marks would have necessarily resulted in a higher sale price. Again, maximum or higher proceeds from the sale are not a right or benefit that Mancini is entitled to under the credit agreement. *Schroeder*, 665 F. Supp. 2d at 226. Even if maximum surplus was an expected benefit, Mancini does nothing to plead or show that UBS *intentionally* marketed the collateral as to deprive Mancini of this surplus. *Id.* Furthermore, neither party argues that UBS's marketing failed to produce sufficient sale proceeds to cover Mancini's indebtedness. For these reasons, the Court finds that UBS did not breach the implied covenant by marketing the sale using the March 31 marks.

3. *UBS Provided Reasonable Notice*

Mancini alleges that UBS rendered its compliance with reasonable notice requirements "meaningless" by telling him over the phone that it was "too late" to "bid in" to the sale. Doc. 24 at 6. The parties do not meaningfully dispute that UBS complied with the notice period requirement: Mancini states that "UBS did provide notice of the collateral sale that satisfied the bare time constraint of the credit agreement."[8] Doc. 24 at 13. Mancini goes on to claim that the facts alleged leave open the question "of whether UBS in fact provided ten-days' notice that was reasonably calculated to allow plaintiff to redeem the collateral." *Id.* However, both the credit agreement and New York law

---

inference of culpability plausible, such allegations must be accompanied by a statement of the facts upon which the belief is founded." *MidCap Business Credit, LLC v. MidCap Financial Trust*, 655 F. Supp. 3d 193, 204 (S.D.N.Y. 2023) (internal quotations and citation omitted). In this Court's opinion, Mancini *has* provided sufficiently detailed facts that allow the Court to assess the plausibility of his claims. For example, it is clear from the facts, and UBS likewise acknowledges, that it did not necessarily use the most recent marks available. *See supra* note 6. However, as discussed in this same Section A.2 and in Section B.1, even taking Mancini's factual basis as sufficient and drawing reasonable inferences from it, the facts alleged simply do not present sufficient grounds for his marketing claims according to both the terms of the credit agreement *and* the legal standards for breach of the implied covenant and breach of the duty to exercise commercial reasonableness.

[8] *See supra* note 1.

recognize that 10-days' notice before sale of the collateral is commercially reasonable. Doc. 18 ¶ 33; Doc. 18-1 at 33, § 8.1(p); N.Y. U.C.C. § 9-612(b).

As with the marketing and deferral issues, Mancini does not allege facts in the complaint that plausibly indicate that UBS acted arbitrarily or irrationally, *Sveaas*, 452 F. App'x at 66, or in bad faith, *Kortright*, 257 F. Supp. 3d at 360, in providing notice to Mancini. Mancini claims that the notice he did receive deprived him of a "meaningful right to redeem." Doc. 24 at 13. However, a right to redeem is neither provided to Mancini under the credit agreement nor assured to him as a function of the implied covenant of good faith and fair dealing. Rather, a right to redeem is assured to debtors through the exercise of commercial reasonableness by creditors under U.C.C. §§ 9-610 and 9-623.

Even if the failure to provide an opportunity to redeem serves as a separate basis for claiming breach of the implied covenant, Mancini does not clearly state if or how UBS failed to comply with the 10-day notice requirement. Indeed, Mancini does not even allege that he called UBS within 10 days of receiving notice of the sale to alert UBS that he wished to redeem the collateral. Mancini is thus unable to claim a contractual or extra-contractual benefit that he was deprived of as a result of the notice he received.

Having reviewed UBS's marketing, timing, and provision of notice, the Court finds that UBS did not breach the implied covenant of good faith and fair dealing. Accordingly, Mancini's first claim for breach of the implied covenant is dismissed.

### B. Breach of Duty of Commercial Reasonableness

Mancini alleges that UBS violated its duty to exercise commercial reasonableness in the way that it marketed, timed, and provided notice of the collateral's sale, depriving Mancini of his right to redeem the collateral under N.Y. U.C.C. §9-623. Specifically, Mancini maintains that UBS used "stale" marks and "failed to market the collateral at the price current in a recognized market." Doc. 24 at 14. Regarding timing of the sale, Mancini states that UBS should have deferred the sale to when more current marks would

12

have been available. And as for notice, Mancini alleges that even though UBS complied with the "bare time constraint" of 10-days' notice, UBS told him that it was "too late" to "bid in," thereby nullifying the reasonableness of UBS's provision of notice.[9] *Id.* at 13.

UBS maintains that the marketing and deferral claims fail as a matter of law because of UBS's "sole and absolute discretion" to market and sell the collateral, with no express duties to market or schedule the sale according to Mancini's preferences. As for Mancini's notice claim, UBS states that this similarly fails as a matter of law because the credit agreement established a 10-day notice period, which has been deemed to be reasonable under New York law. N.Y. U.C.C. § 9-612(b); Doc. 18-1 at 33, § 8.1(p).

In sum, Mancini's allegations concerning commercial reasonableness, and UBS's responses, mirror the parties' arguments concerning the implied covenant. The allegations fail for substantially the same reasons.

Viewed as a whole, the sale process was commercially reasonable. Mancini has not offered any evidence demonstrating that the sale price was improperly low compared to October fair market values *or* the collateral's pre-pandemic values. Mancini also offers a scant factual basis and no case law to support his proposition that, through the parties' phone conversation, UBS "nullified" his right to receive reasonable notice, resulting in a denial of Mancini's right to redeem—especially when Mancini does not allege that he tried to assert his right to redeem *within* the 10-day notice period.

1. *UBS Marketed the Collateral in a Commercially Reasonable Manner*

A creditor or secured party must dispose of collateral in a commercially reasonable manner. N.Y. U.C.C. § 9-610. For dispositions of collateral conducted

---

[9] Mancini raises in a footnote that "the allegation that UBS's purported notice concealed the actual date on which the collateral was disposed, and after which Plaintiff was 'too late' to discuss redeeming his collateral, also provides 'specific factual allegations of UBS's alleged bad faith.'" Doc. 24 at 13, footnote 8. Mancini further states that he would seek to provide more information about UBS's bad faith in a Second Amended Complaint. *Id.* Specifically, Mancini further asserted that "[b]y April 19, 2024, [he] expects to file a letter motion seeking leave of Court to file a second amended complaint to supply that factual support." *Id.* at 8. However, Mancini never filed this letter motion.

according to § 9-610, § 9-623 ("Right to Redeem Collateral") provides that debtors "may redeem collateral as long as the secured party has not . . . disposed of or contracted for the disposition of . . . the collateral." *Id.* § 9-623, Official Comment 2.

"Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." *Id.* § 9-610(b); *see also Life Insurance Fund Elite LLC v. Hamburg Commercial Bank AG*, 545 F. Supp. 3d 86, 91 (S.D.N.Y. 2021) ("[A] secured party must dispose of collateral via commercially reasonable methods"). "[T]he UCC requirement that any post-default disposition of collateral be commercially reasonable . . . may not be waived." *Marine Midland Bank v. CMR Industries, Inc.*, 559 N.Y.S.2d 892, 900 (N.Y. App. Div. 1990). Assessing commercial reasonableness involves "the totality of the circumstances, including the good faith efforts of the creditor." *FDIC v. Wrapwell Corp.*, No. 93 Civ. 859 (CSH), 2002 WL 14365, at *9 (S.D.N.Y. Jan. 3, 2002). To show "that a sale was commercially unreasonable, a plaintiff must allege not merely that the property's fair market value exceeded the sale price, but that it did so by an amount that 'shocks the court's conscience.'" *Liu v. Bank of America*, No. 08 Civ. 3358 (JG), 2010 WL 1702537, at *2 (E.D.N.Y. Apr. 28, 2010) (quoting *DeRosa v. Chase Manhattan Mortg. Corp.*, 782 N.Y.S.2d 5, 9 (N.Y. App. Div. 2004)).

The U.C.C. describes disposition as commercially reasonable if it is made: "(1) in the usual manner on any recognized market; (2) at the price current in any recognized market at the time of the disposition; or (3) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition." N.Y. U.C.C. § 9-627(b); *see also CCO Condo Portfolio (AZ) Junior Mezzanine, LLC v. Feldman*, No. 21 CIV. 2508 (ER), 2024 WL 622098, at *3 (S.D.N.Y. Feb. 14, 2024) ("Defendants have not offered any evidence of their own to show that the fair market value of the properties was dramatically higher than the sale price. As a result, the Court cannot conclude that the price was so unreasonable as to shock the

conscience"). "The fact that a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner." N.Y. U.C.C. § 9-627(a).

Mancini does not provide a sufficient legal or factual basis to plausibly claim that UBS's marketing of the collateral was commercially unreasonable. Mancini offers no other marks or projected sale figures to compare to the March marks and total sale proceeds. Mancini only claims that at the end of October *2019*, he had developed a portfolio of CCEs that had a fair market value of more than $4 million. In other words, Mancini only provides one remote data point and conclusory statements that UBS could and should have used more recent marks to yield some higher figure.

Mancini also does not show how the total net proceeds ($2,536,576.67) fell drastically below the collateral's market value in September or October 2020. Mancini certainly does not provide figures or information to show that the sale proceeds were so far below the collateral's fair market value (or Mancini's indebtedness) as to "shock the court's conscience." *Liu*, 2010 WL 1702537, at *2; *see also* Doc. 13 ¶ 31. UBS argues in its memo in support of the motion that "the Sale yielded more than 63% of the Collateral's fair market value (as alleged by [Mancini]) and was thus commercially reasonable as a matter of law." Doc. 20 at 21. The sale's total net proceeds ($2,536,576.67) to Mancini's indebtedness ($2,017,123.50) clearly covered Mancini's indebtedness ($2,017,123.50), and neither the credit agreement nor the U.C.C. place further responsibility upon UBS to market the collateral to maximize proceeds beyond an amount that is manifestly unreasonable or shocking. *Id.* "The fact that a greater amount could have been obtained by a . . . disposition . . . in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, disposition, or acceptance was made in a

15

commercially reasonable manner." N.Y. U.C.C. § 9-627(a). Therefore, UBS did not breach the duty to exercise commercial reasonableness by marketing the sale using the March marks.

### 2. UBS Was Not Under a Duty to Defer the Timing of the Sale

Under New York law, a secured creditor is under no obligation to delay sale of collateral in the hope of obtaining a higher price, unless the timing of the sale renders it commercially unreasonable. *SNCB Corporate Finance Ltd. v. Schuster*, 877 F. Supp. 820, 828 (S.D.N.Y. 1994). Mancini repeatedly attests that the sale should have been deferred. *See, e.g.*, Doc. 13 ¶ 33. However, Mancini does not provide a convincing basis, even "upon information and belief," for finding that UBS would have secured higher proceeds had it deferred the sale to October or early November. New York law imposes no duty upon secured parties to defer the disposition of collateral following a debtor's default. N.Y. U.C.C. § 9-627(a). *See also SNCB Corp.*, 877 F. Supp. at 828. In turn, the Court does not find that the timing of the sale and UBS's purported failure to defer resulted in a commercially unreasonable sale or violation of the duty to exercise commercial reasonableness.

### 3. UBS's Notice to Mancini Did Not Make the Sale Commercially Unreasonable Because It Complied with the Notice Requirements of the Credit Agreement and Article 9

To the extent that reasonable and timely notice is a requirement of commercial reasonableness, the New York legislature has deemed 10-days' notice before disposition of collateral to be reasonable. N.Y. U.C.C. § 9-612(b). Mancini has not identified any authority indicating that a 10-day window between the time of notice and commencement of a collateral's sale is commercially unreasonable. Furthermore, as deemed reasonable under N.Y. U.C.C. § 9-612(b), both parties agreed that 10-days' notice before disposition of collateral would be reasonable in the credit agreement under § 8.1(p).

Mancini also fails to provide facts that demonstrate that UBS did not provide 10-days' notice. Mancini himself recognizes UBS's fulfillment of its duty of reasonable

16

notice: "despite literal compliance, the customer, as was the case here, was told upon inquiry that it was 'too late' for him 'to bid in,'" and thus preserve his own property." Doc. 24 at 7. And importantly, he does not allege that he called UBS within 10 days of receiving notice on August 26, 2024 to alert the bank that he wished to redeem the collateral.

While it is true that Article 9 requires that secured parties provide debtors with the right to redeem collateral under U.C.C. § 9-623, Mancini has not shown that he was deprived of this right due to noncompliance with the notice provision.

"Plaintiff's concession . . . that UBS provided timely notice of its intent to sell the Collateral is dispositive of the Notice Claim. Plaintiff offers no authority to support its unprecedented argument that otherwise timely notice may be rendered ineffective and untimely if Plaintiff later alleges that the contractually mandated notice period failed to provide him with an extra-contractual right to redeem collateral prior to its disposition, and that argument misstates governing New York law, which recognizes a 10-day notice period as reasonable." Doc. 26 at 1–2. Thus, the Court grants the motion for judgment on the pleadings for the second cause of action in favor of UBS.

IV.   CONCLUSION

For the reasons set forth above, the motion for judgment on the pleadings is granted. Mancini may file a Second Amended Complaint, if at all, by December 12, 2024. If Mancini does not do so, the case will be closed. The Clerk of Court is respectfully directed to terminate the motion, Doc. 19.

It is SO ORDERED.

Dated:   November 21, 2024
         New York, New York

                                                              _____
                                                              EDGARDO RAMOS, U.S.D.J.