UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERT S. MANCINI,

                    Plaintiff,

          – *against* –

UBS AG, NEW YORK BRANCH,

                    Defendant.

**OPINION & ORDER**

23-cv-09815 (ER)

RAMOS, D.J.:

Robert S. Mancini brings this action for breach of contract, breach of the duty to exercise commercial reasonableness, and breach of the implied covenant of good faith and fair dealing against the New York Branch of UBS AG ("UBS").  Before the Court is UBS's motion for judgment on the pleadings.  Doc. 37.  For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

**I.     BACKGROUND[1]**

The Court assumes familiarity with the facts and procedural history as set forth in its previous opinion, Doc. 27 at 1–5, and recounts only those facts necessary for disposition of the instant motion.

**A.  Factual Background[2]**

Mancini, a citizen and resident of Connecticut, is an investment professional with more than 30 years of investment experience.  ¶¶ 3, 5, 36.  UBS is a Swiss multinational investment bank whose New York Branch provides, *inter alia*, lending, brokerage, and investment services.  ¶¶ 4, 6.

---

[1]  Unless otherwise noted, citations to "¶ _" refer to the second amended complaint ("SAC"), Doc. 35.

[2]  The following facts are drawn from the well pleaded allegations in the SAC—which the Court accepts as true for the purposes of the instant motion—as well as the documents referenced therein.  Doc. 35; Doc. 35-1 (Exhibit A); Doc. 35-2 (Exhibit B).

Beginning in December 2012, Mancini worked for the Carlyle Group ("Carlyle"), a New York private equity firm, as a partner, before becoming a managing director and global partner of the firm up until his departure in June 2018.[3] ¶ 7. By virtue of his position as a partner at Carlyle, Mancini was eligible to participate in certain private equity investments known as "Carlyle Co-investment Entities" ("CCEs"). *Id.* Through an arrangement between UBS and Carlyle, the bank offered loans to eligible participants like Mancini to acquire interests in the CCEs, which are similar to securities. ¶ 8.

In order to participate in the CCE investments offered by Carlyle, Mancini and UBS executed a Borrower and Summary Credit Agreement and other financing documents on January 8, 2013. Doc. 18-1; Doc. 35-1. These documents outlined Mancini's acknowledgement, rights, and obligations under a broader governing Master Credit Agreement (the "Credit Agreement"), executed on September 15, 2011, between Mancini as borrower and UBS as creditor. ¶ 9. Mancini's interests in the CCEs secured the credit, such that the CCE interests stood as collateral for the underlying loan and were maintained in full custody by UBS. ¶ 10. The Credit Agreement is governed by New York law, including the New York Uniform Commercial Code (the "N.Y. U.C.C."). ¶ 12; Doc 35-1 at 31.

Section 8.1(p) of the Credit Agreement provided that, if Mancini failed to pay amounts when due under the Credit Agreement:

> [U]pon notice to [Mancini], such Credit Line Obligations will become immediately due and payable . . . and [UBS] may, in its sole and absolute discretion, but, subject to the terms of this Agreement and the other Loan Documents . . . liquidate, withdraw or sell, in each case . . . all or any part of the Collateral pledged to secure such Credit Line Obligations and apply the same, as well as the proceeds of any liquidation or sale, to any amounts owed to [UBS].

Doc. 35-1 at 29. In the event Mancini failed to pay as required and UBS decided to liquidate the collateral, UBS was required to do so in a "commercially reasonable"

---

[3] Carlyle is not a party to this suit. ¶ 7.

manner, per New York law. ¶¶ 18, 19. One of these requirements was that the bank afford Mancini "reasonable notice"—provided for in Section 8.1(p) of the Credit Agreement, in accordance with the N.Y. U.C.C. ("[A] notification of disposition sent after default and 10 days or more before the earliest time of disposition set forth in the notification is sent within a reasonable time before the disposition."). N.Y. U.C.C. § 9-612(b).

On June 6, 2018, Mancini left his role as a managing director and global partner at Carlyle and transitioned to "senior advisor" status. ¶ 12. Mancini resigned and fully withdrew from Carlyle sometime in December 2018 and thus no longer qualified to participate in the CCE lending arrangement under the Credit Agreement. *Id.*

On February 5, 2019, UBS notified Mancini by letter that his withdrawal from Carlyle constituted a "Final Event" as defined in the Credit Agreement, triggering repayment of the loan to UBS. Doc. 18-1 at 11. In this same letter, UBS also demanded repayment by the maturity date of the loan, March 15, 2019. ¶¶ 12, 13.

Ten days later, on February 15, 2019, the parties agreed to extend the loan's maturity date to March 1, 2020, by which time Mancini would be required to repay the loan. ¶ 13. Mancini alleges that "[b]y December 31, 2019, [he] had built a portfolio of CCEs, pledged to UBS as collateral, which had a fair market value of more than $3.5 million, and his portfolio also contained approximately $500,000 in cash," for a total value of approximately $4 million. ¶ 14.

However, at the start of 2020, the COVID-19 pandemic began spreading across the United States, and the fair market value of Mancini's CCE holdings in March 2020 purportedly "sustain[ed] a loss from approximately $3,500,000 from their year-end 2019 values to $3,162,614 according to the quarterly market prices made available by Carlyle." ¶ 22. Mancini claims, however, that by June 30, 2020, the holdings had regained approximately 14% of their value, and by September 30, 2020, approximately 18% of their value, to $3,727,602. *Id.* Mancini alleges that "[i]n or about March 2020, a senior

executive of . . . UBS assured Mancini that, in view of the pandemic-related market declines, UBS did not intend at that time to liquidate the collateral consisting of the CCEs and cash." ¶ 23.

On August 26, 2020, UBS provided Mancini with written notice (the "August 26 notice") that the bank would sell all or part of the collateral by private sale "on or after September 10, 2020." ¶ 24; Doc. 35-2.[4] The August 26 notice also stated that "[a]ll terms and conditions of the [c]redit [d]ocuments remain unchanged and in full force and effect. This notice shall not constitute any waiver of the Bank's rights and remedies." Doc. 35-2.

Mancini placed a call to UBS "[d]uring the week of August 30, 2020, and more than a week before the September 10, 2020 notice date . . . to discuss purchasing the indebtedness and redeeming the collateral himself." ¶ 25. However, Mancini alleges that the bank representative responded that UBS "had already initiated the process of liquidating the collateral, that he could not repay the loan or redeem the collateral, and that it was 'too late.'" *Id.*

Following this phone call, Mancini requested an accounting of the liquidation which showed that: the sale was consummated on October 9, 2020; all of the seven assets that constituted the collateral were sold "effective October 1, 2020"; Mancini owed UBS $2,017,123.50; UBS realized total gross proceeds of $2,895,229 from the liquidation; and UBS had taken $358,652.33 in deductions and expenses against the gross proceeds, resulting in net proceeds of $2,536,576.67. Doc. 36-3 at 2, 3. Subtracting Mancini's unpaid indebtedness to UBS in the amount of $2,017,123.50, the net proceeds yielded a final total of $519,453.17 due to Mancini. *Id.*; *see also* Doc. 38 at 3. Mancini

---

[4] The specific language of the August 26 notice provides that: "Notice is hereby given that we will sell all, or one or more portion(s), of the collateral set forth on Exhibit A hereto privately sometime on or after September 10, 2020." Doc. 35-2.

4

asserts that a UBS loan officer informed him that the bank had used "the Carlyle March 31[, 2020] fair market values (marks or market price)" in marketing the portfolio.[5] ¶ 35.

Mancini alleges that UBS unlawfully disposed of the collateral by: erroneously notifying him of the timing of the liquidation when the bank told him that it was "too late" to repurchase the debt or redeem the collateral; marketing the collateral using purportedly outdated March marks; and selling the collateral without providing Mancini an opportunity to bid on and redeem the collateral "to protect his assets." ¶¶ 35–37. In his first amended complaint ("FAC"), Mancini alleged that UBS violated its duty to exercise commercial reasonableness and the implied covenant of good faith and fair dealing. Doc. 13 at 8–9. In his SAC, he reasserts these claims, while also alleging a new claim for breach of certain "express contractual dut[ies]." ¶¶ 39–54.

### B. Procedural History

Mancini commenced the instant action on November 6, 2023, Doc. 1, and filed the FAC on February 9, 2024. Doc. 13. The Court granted UBS's motion for judgment on the pleadings on November 21, 2024, and provided Mancini with the opportunity to file a second amended complaint. Doc. 27. Mancini filed the SAC on January 21, 2025. Doc. 35. UBS filed its answer to the SAC and the instant motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) on March 4, 2025. Docs. 36, 37. In its motion, UBS also requested that the case be dismissed with prejudice. Doc. 37.

## II.    LEGAL STANDARD

Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, a party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). "Pleadings" include both the "complaint" and the "answer to [the] complaint." Fed. R. Civ. P. 7(a). "The standard for granting a Rule

---

[5] "Marks" refer to a method of measuring the collateral's value, which is subject to overall market fluctuations and used in marketing said collateral as an overall realistic proxy of their current fair market value. ¶ 31 n.1.

12(c) motion for judgment on the pleadings is identical to that [for granting] a Rule 12(b)(6) motion for failure to state a claim." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). A Rule 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." *Burns International Security Services, Inc. v. International Union, United Plant Guard Workers of America (UPGWA) & Its Local 537*, 47 F.3d 14, 16 (2d Cir. 1995) (per curiam). To survive a Rule 12(c) motion, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Lively v. WAFRA Investment Advisory Group, Inc.*, 6 F.4th 293, 301 (2d Cir. 2021). To establish the case's facts on a Rule 12(c) motion, the Court may consider "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011). "The Court may also consider documents incorporated into the complaint by reference or integral to the complaint, provided there is no dispute regarding their authenticity, accuracy, or relevance." *Thyssenkrupp Materials NA, Inc. v. M/V Kacey*, 236 F.Supp.3d 835, 838 (S.D.N.Y. 2017). In addition, the Court draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "allegations that are 'conclusory' are 'not entitled to be assumed true.'" *Lynch*, 952 F.3d at 74, 75 (quoting *Iqbal*, 556 U.S. at 679, 681). After reviewing the pleadings and attached exhibits, a Rule 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." *Burns International*, 47 F.3d at 16. "[W]here the material facts are undisputed, the Court may decide as a matter of law that the [defendant's] actions were commercially reasonable." *Leigh Co. v. Bank of New York*, 617 F. Supp. 147, 153 (S.D.N.Y. 1985).

## III.    DISCUSSION

In his SAC, Mancini alleges asserts three claims against UBS for: (1) breach of certain express contractual duties, (2) breach of the duty of commercial reasonableness,

and (3) breach of the implied covenant of good faith and fair dealing.[6]  Doc. 35 at 9–11.
The Court addresses each in turn.

### A.  Breach of Express Contractual Duties

Mancini first alleges that UBS breached certain "express contractual dut[ies]."
Doc. 35 at 9.  UBS argues that this claim should be dismissed because Mancini has not
plausibly alleged that any express contractual term was breached.  Doc. 38 at 6.  The
Court agrees.

To state a breach of contract claim in New York, a plaintiff must allege "the
existence of a contract, the plaintiff's performance pursuant to the contract, the
defendant's breach of his or her contractual obligations, and damages resulting from the
breach."  *Tri-Star Lighting Corp. v. Goldstein*, 58 N.Y.S.3d 448, 453 (2d Dep't 2017).  In
pleading these elements, "a plaintiff must identify what provisions of the contract were
breached as a result of the acts at issue."  *Ellington Credit Fund, Ltd. v. Select Portfolio
Servicing, Inc.*, 837 F. Supp. 2d 162, 189 (S.D.N.Y. 2011).  In determining a party's
obligations under a contract, "the initial interpretation of a contract is a matter of law for
the court to decide."  *K. Bell & Associates, Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637
(2d Cir. 1996) (citation modified).

Mancini offers two theories in support of his express contractual breach claim.
He argues, first, that UBS breached its duty under the Credit Agreement to provide him
with at least ten days' written notice of the date after which UBS would dispose of the
collateral.  ¶ 40.  In support of this contention, Mancini cites § 8.1(p) of the Credit
Agreement.  *Id.*; Doc. 51 at 9–10 (arguing that this provision "clearly provided [him]

---

[6]  In his opposition brief, Mancini also attempts to assert an additional claim for a "facial violation" of the
U.C.C., based on his contention that the collateral should not have been sold "at a private disposition"
because it was not "of a kind that is customarily sold on a recognized market or the subject of widely
distributed standard price quotations."  *See* Doc. 51 at 24 (quoting N.Y. U.C.C. Law § 9-610(c)(2)).  But
even if the Court considered this claim, *United States v. Westchester Fire Insurance Co.*, No. 22 Civ. 15
(NSR), 2025 WL 2781687, at *6 (S.D.N.Y. Sept. 30, 2025) (explaining that "a party may not assert new
facts or legal theories for the first time in opposition papers"), the SAC plainly lacks any factual allegations
that would support it.

with the right to not less than 10 days' written notice"). But in that section, the parties merely "agree[d] that . . . ten (10) calendar days notice to . . . [the] Borrower . . . *will be deemed reasonable* notice of the time and place of any public sale or time after which any private sale or other disposition of the [c]ollateral may occur." Doc. 35-1 at 28 (emphasis added); *see* Doc. 51 at 9. Thus, the provision does not suggest that less than ten days' notice is necessarily unreasonable—or, importantly, that UBS agreed to provide at least ten days' notice. Rather, in including this language, the parties simply incorporated § 9-612(b) of the N.Y. U.C.C., which states that "a notification of disposition sent after default and 10 days or more before the earliest time of disposition set forth in the notification" is necessarily "sent within a reasonable time before the disposition." N.Y. U.C.C. § 9-612. And, under that provision, the ten-day period is "not a minimum requirement" for reasonableness, but rather a "safe harbor" from the general requirement that a notification must be sent at reasonable time prior to the collateral's disposition. N.Y. U.C.C. § 9-612, Official Comments 2 & 3. Thus, Mancini's assertion that UBS breached an "express" contractual duty to provide at least ten days' notice lacks merit.

Mancini next alleges that UBS breached its express duty under the Credit Agreement and the August 26 notice when it started disposing of the collateral prior to September 10, 2020, and informed him that he could not redeem the collateral at least a week prior to that date. ¶ 41; Doc. 51 at 9.[7] But, in support of his theory that these duties were "express[ly]" provided for in the Credit Agreement, Mancini relies on the same language from § 8.1(p). Doc. 51 at 9. And that language, for the reasons already explained, merely reflects the parties' agreement to incorporate the U.C.C.'s ten-day safe harbor. Thus, the Court cannot see how it explicitly imposes the duties that Mancini

---

[7]  In his opposition brief, Mancini also alleges that UBS breached the Credit Agreement by failing to notify "all contractually required parties" in addition to him. Doc. 51 at 7. But because Mancini failed to include this allegation in his SAC, the Court does not consider it. *See Torchlight Loan Services, LLC v. Column Financial, Inc.*, No. 11 Civ. 7426 (RWS), 2012 WL 3065929, at *11 (S.D.N.Y. July 25, 2012) ("[P]arties cannot amend their pleadings by including new factual allegations in an opposition brief to a motion to dismiss.").

seeks to place upon it.  And while the August 26 notice does explicitly state that UBS "will sell all, or one or more portion(s), of the collateral . . . sometime on or after September 10, 2020," it contains no explicit promise that UBS would refrain from completing the sale or permit Mancini to redeem the collateral prior to that date.  Doc. 35-2 at 2.[8]  Thus, the August 26 notice cannot support Mancini's express breach of contract claim.

In sum, Mancini has not plausibly alleged that the Credit Agreement or the August 26 notice expressly prohibited UBS from providing him with less than ten days' notice, disposing of the collateral prior to September 10, 2020, or informing him that he could not redeem the collateral prior to the date.  Insofar as Mancini's breach of contract claim is premised on the theory that UBS breached any express contractual provisions, it is therefore dismissed.[9]

### B.  Breach of the Duty of Commercial Reasonableness

#### 1.  *Through Use of the March 2020 Marks*

Mancini also alleges that UBS violated its duty to exercise commercial reasonableness by marketing the collateral through use of the March 2020 marks.  ¶ 46; Doc. 51 at 19.  UBS moves to dismiss this claim because it contends that Mancini has failed to allege any additional facts that show that its use of the marks was commercially unreasonable.  Doc. 38 at 6–7.  Here, again, the Court agrees that the claim must be dismissed.

---

[8]  Nor is it clear that the notice is itself a binding contract insofar as lacks any invitation of acceptance.  *See Krolick v. Sloane*, No. 17 Civ. 0881 (RA), 2021 WL 5280990, at *5 (S.D.N.Y. Nov. 12, 2021) ("A unilateral contract is a contract in which the offer *invites acceptance* not in the form of a promise, but rather, in the form of actual performance." (emphasis added)); *see also Volunteers of America of Western New York, Inc. v. Rochester Gas & Electric Corp.*, No. 6:99 Civ. 6238 (MAT), 2014 WL 3510495, at *8 (W.D.N.Y. July 14, 2014) ("A unilateral contract consists of an offer or promise to do something *in exchange for* an act." (emphasis added)).

[9]  Because Mancini asserted this claim for the first time in his SAC, the dismissal is without prejudice.  *See Cook v. Dewitt*, No. 19 Civ. 2780, 2022 WL 580774, at *4 (S.D.N.Y. Feb. 25, 2022) (explaining that "dismissal with prejudice is appropriate" where "the Court has put Plaintiff on notice of the deficiencies in his original complaint and given him an opportunity to correct these deficiencies in an Amended Complaint, but Plaintiff has failed to do so").

"After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing." N.Y. U.C.C. § 9-610(a). "Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." N.Y. U.C.C. § 9-610(b). Commercial reasonableness is determined by "the totality of the circumstances, including the good faith efforts of the creditor." *FDIC v. Wrapwell Corp.*, No. 93 Civ. 859 (CSH), 2002 WL 14365, at *9 (S.D.N.Y. Jan. 3, 2002). Even if a "marked discrepancy between the price obtained and the value of the collateral may signal a need for closer scrutiny, such a price difference alone does not make a sale commercially unreasonable." *SNCB Corporate Finance Ltd. v. Schuster*, 877 F. Supp. 820, 828 (S.D.N.Y. 1994) (internal quotations omitted). Thus, to show "that a sale was commercially unreasonable" based solely on the sale price, "a plaintiff must allege not merely that the property's fair market value exceeded the sale price, but that it did so by an amount that 'shocks the court's conscience.'" *Liu v. Bank of America*, No. 08 Civ. 3358 (JG), 2010 WL 1702537, at *2 (E.D.N.Y. Apr. 28, 2010) (quoting *DeRosa v. Chase Manhattan Mortgage Corp.*, 782 N.Y.S.2d 5, 9 (1st Dep't 2004)).

Here, Mancini argues that UBS's use of the March 2020 marks was commercially unreasonable because "[h]ad UBS'[] sale of the collateral been based on the higher June or September 2020 Carlyle marks rather than the lower March 2020 marks, the collateral liquidation would have generated a substantially higher price than it did." ¶ 36. In its previous order, the Court rejected this argument because "Mancini offer[ed] no other marks or projected sale figures to compare the March marks and total sale proceeds." Doc. 27 at 15. Thus, the Court had no basis to plausibly infer that the use of the marks resulted in a conscious-shocking sales price and was therefore commercially unreasonable. *Id.*

10

In the SAC, Mancini attempts to cure this deficiency through offering an additional datapoint:  he alleges that, although the fair market value of the collateral according to the March 2020 marks was $3,162,614, by September 2020, that value had increased to $3,727,602.  ¶¶ 22, 33.  But even accepting that allegation as true, it still fails to salvage Mancini's claim, because the $2,895,229 that UBS received in proceeds is only approximately 78% of the $3,727,602 that allegedly represents the fair market value.[10] And that difference is not sufficiently stark to "shock the conscience."  *See Liu*, 2010 WL 1702537, at *2 ("As a matter of law, an allegation that a mortgaged property was sold for 20 percent less than its fair market value price is insufficient to state a claim for commercially unreasonable foreclosure."); *see also In re Futterman*, 602 B.R. 465, 478 (Bankr. S.D.N.Y. 2019) ("New York courts generally have held that a sale of collateral for a price that is less than 10% of its real value is unconscionable, while sales at or above 50% of fair market value have consistently been upheld.").  Thus, the SAC also fails to state a claim on this basis.[11]  Because the Court put Mancini on notice of these deficiencies in its previous opinion and Mancini failed to correct them in the SAC, this claim is dismissed with prejudice.  *See Cook*, 2022 WL 580774, at *4.

### 2.  *Through Failing to Provide Reasonable Notice*

Mancini further alleges that UBS violated its duty to act in a commercially reasonable manner through failing to provide reasonable notice of the collateral sale.

---

[10]  In his opposition, Mancini suggests for the first time that the proceeds should be reduced by $500,000, because the collateral included that amount in cash.  Doc. 51 at 22.  But even if the Court accepted that premise, the sale price would still represent approximately 64% of the alleged market value, which, as a matter of law, does not shock the conscience.  *See In re Futterman*, 602 B.R. 465, 478 (Bankr. S.D.N.Y. 2019).

[11]  In his opposition, Mancini also argues that the Court should infer that the sale was commercially unreasonable because UBS has not provided him with additional details about its marketing efforts or the identity of the purchaser or purchasers of the collateral.  Doc. 51 at 15–16.  But Mancini does not argue that UBS had a duty to provide such information or identify any authority that would suggest that it did.  And insofar as Mancini implicitly argues that he should be permitted to proceed with his claim because he needs discovery to determine whether the sale was commercially reasonable, the Court notes that "the federal rules [of civil procedure] do not allow a litigant to file a case in order to get discovery to find out if he has a case."  *Neal v. Asta Funding, Inc.*, No. 13 Civ. 2176 (VB), 2014 WL 3891239, at *2 (S.D.N.Y. June 27, 2014) (quoting *Rosendale v. Lejeune*, 420 F. Supp. 2d 315, 325 (S.D.N.Y. 2006)).

¶ 46; *see also Life Insurance Fund Elite LLC*, 545 F. Supp. 3d at 92 (explaining that an argument based on "lack of notice regarding the sale" is premised on the secured party's "duty to act commercially reasonably"); *Paco Corp. v. Vigliarola*, 611 F. Supp. 923, 925 (E.D.N.Y. 1985), *aff'd*, 835 F.2d 1429 (2d Cir. 1987) (same).  In support of this claim, he alleges that, "more than a week before the September 10, 2020 notice date, [he] placed a telephone call to UBS to discuss purchasing the indebtedness and redeeming the collateral himself."  ¶ 25.  He further alleges that, on that call, and "contrary to the terms of the August notice, UBS advised [him] that it had already initiated the process of liquidating the collateral, that he could not repay the loan or redeem the collateral, and that it was 'too late.'"  *Id.*  Mancini alleges that he was deprived of the ten days' notice that the parties agreed would be reasonable "because [UBS] started the sale process" early and thus deprived him of his statutory right to redeem the collateral.  Doc. 51 at 10, 23.

In general, the N.Y. U.C.C. "grants the secured creditor the right to dispose of collateral in cases of default, as long as notice is sent to the debtor, and the sale is commercially reasonable as to the time, place, manner and terms."  *Sumner v. Extebank*, 452 N.Y.S.2d 873, 874 (1st Dep't 1982), *aff'd as modified*, 58 N.Y.2d 1087 (1983).  The notice that is provided to the debtor must be "reasonable" and include, *inter alia*, "the time and place of a public disposition or the time after which any other disposition is to be made."  N.Y. U.C.C. §§ 611, 613.  For notice to be reasonable, it must also be sent "at a reasonable time in advance of the date of a public disposition or the date after which a private disposition is to be made."  N.Y. U.C.C. § 9-612, Official Comment 2.  "A notification that is sent so near to the disposition date that a notified person could not be expected to act on or take account of the notification would be unreasonable."  *Id.*  The purpose of the notice requirement is, in part, "to give the debtor an opportunity to protect his interest in the collateral by exercising any right of redemption."  *Coxall v. Clover Commercial Corp.*, 4 Misc. 3d 654, 658 (N.Y. Civ. Ct. 2004).  Thus, reasonable notice

requires that the secured party take "reasonable measures . . . to notify the debtor of any scheduled sale of collateral in sufficient time to enable him to protect his interests if he so desires." *Dougherty v. 425 Development Associates*, 462 N.Y.S.2d 851, 853 (1st Dep't 1983).

UBS moves to dismiss this claim because, in its view, Mancini "has not and cannot allege that UBS did not provide timely notice." Doc. 38 at 6. In support of this contention, it relies on the Court's prior conclusion that the FAC failed to allege "facts that demonstrate that UBS did not provide 10-days' notice." Doc. 27 at 16. But in advancing this argument, UBS ignores the context of the Court's previous statements—and, critically, the new facts alleged in the SAC. As the Court recognized in its opinion dismissing the FAC, the FAC was devoid of any allegations regarding the timing of Mancini's phone call. Doc. 27 at 4 & n.2. The SAC, by contrast, explicitly alleges that the call occurred at least before September 3, 2020. ¶ 25. Thus, unlike the FAC, the SAC plausibly alleges that, by September 3, 2020, at the latest, UBS had already sold, or begun to sell, at least a portion of the collateral. *See* N.Y. U.C.C. Law § 9-623, Official Comment 3 ("Under Section 9-610 a secured party may make successive dispositions of portions of its collateral. These dispositions would not affect the debtor's . . . right to redeem the remaining collateral."). The SAC also plausibly alleges that, at the time of that partial sale, UBS provided only retroactive notice of the timing of that disposition—and only in response to Mancini's request to redeem the collateral. And, as a matter of law, retroactive notice—at least as to any portion of the collateral already disposed—would be unreasonable. *See* N.Y. U.C.C. § 9-612, Official Comment 2 ("A notification that is sent so near to the disposition date that a notified person could not be expected to act on or take account of the notification would be unreasonable."). Nor can the August 26 notice remedy that deficiency, given that notice must include "the time and place of a public disposition or the time after which any other disposition is to be made," N.Y. U.C.C. § 613, and the August 26 notice explicitly stated that the sale would occur

13

"sometime on or after September 10, 2020," Doc. 35-2. Thus, drawing all reasonable inferences in Mancini's favor, the SAC plausibly alleges that UBS acted in a commercially unreasonable manner in failing to provide reasonable notice of its disposition of the collateral.

### C.  Breach of the Implied Covenant of Good Faith and Fair Dealing

Mancini's final claim for breach of the implied covenant of good faith and fair dealing is explicitly premised on his commercial reasonableness claim. *See* ¶ 50 (alleging that UBS "breached the covenant of good faith and fair dealing" because "it was not commercially reasonable to sell the collateral at the March prices"); ¶ 54 (alleging that UBS breached the implied covenant because its "failure to abide by its own agreed notice period was not commercially reasonable"). Moreover, in his opposition brief, Mancini does not address this claim separately; rather, he argues that, under the duty of commercial reasonableness, UBS had a duty to act in good faith. *See* Doc. 51 at 12, 15, 18, 19. In other words, Mancini's implied covenant of good faith and fair dealing claim merely repackages his claim that UBS violated the duty of commercial reasonableness. Because these claims are duplicative, Mancini's good faith and fair dealing claim must be dismissed. *See Life Insurance Fund Elite LLC v. Hamburg Commercial Bank AG*, 545 F. Supp. 3d 86, 92 (S.D.N.Y. 2021) (dismissing a claim based on the breach of the implied covenant of good faith and fair dealing as duplicative where it "merely amount[ed] to a restatement of" the "breach-of-commercial-reasonableness claim").

In addition, and as UBS notes, the Court previously rejected Mancini's claim that UBS's use of the March marks and failure to provide reasonable notice violated the implied covenant of good faith and fair dealing, and Mancini offers no additional factual allegations that correct the identified deficiencies. Doc 38 at 5, 7–8; *see* Doc. 27 at 11 (explaining that the marks-based claim failed because Mancini had not plausibly alleged that UBS intentionally marketed the collateral to deprive him of the surplus); *id*. at 12 (explaining that Mancini's notice-based claim failed because it was more properly

asserted as a breach of the duty of commercial reasonableness). Thus, the dismissal of this claim is with prejudice.

## IV.    CONCLUSION

For the reasons set forth above, the motion for judgment on the pleadings is GRANTED in part and DENIED in part. Because the case will proceed on the merits, UBS's request to file a motion for attorneys' fees is premature, Doc. 38 at 9, and thus denied without prejudice. The Clerk of Court is respectfully directed to terminate the motion, Doc. 37.

The parties are further directed to appear for a conference on April 30, 2026, at 11 a.m. in Courtroom 619 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, NY 10007.

It is SO ORDERED.

Dated:    March 30, 2026
          New York, New York

_____
EDGARDO RAMOS, U.S.D.J.

15